

1  Michael P. Lehmann (Cal. Bar No. 77152)
2  Christopher L. Lebsock (Cal. Bar No. 184546)
   Jon T. King (Cal. Bar No. 205073)
   Arthur N. Bailey (Cal. Bar No. 248460)
3  COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
   One Embarcadero Center. Suite 2440
4  San Francisco, CA 94111
   Tel: (415) 229-2080
5  Fax: (415) 986-3643
   E-mail: mlehmann@cmht.com
6          clebsock@cmht.com
           jking@cmht.com
7          abailey@cmht.com

8
9  [Additional counsel listed on signature page]

10 *Counsel for Plaintiff E&M International Transport,
   Inc. and the proposed Class*

11

12                          CV  08   3537

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15

16

17 E&M INTERNATIONAL TRANSPORT,        Case No.
   INC., on behalf of itself and all others
18 similarly situated,

19            Plaintiff,               **CLASS ACTION COMPLAINT**

20 v.                                  **DEMAND FOR JURY TRIAL**

21 HORIZON LINES, INC.; HORIZON
   LINES, LLC; MATSON NAVIGATION
22 COMPANY, INC.; and ALEXANDER &
   BALDWIN, INC.,
23
24            Defendants.

25

26

27

28

COHEN, MILSTEIN,
HAUSFELD & TOLL,
P.L.L.C.         CLASS ACTION COMPLAINT
ATTORNEYS AT LAW

## INTRODUCTION

1.     Plaintiff E&M International Transport, Inc. brings this action both individually and on behalf of a Class of plaintiffs consisting of all persons and entities in the United States, and its territories and possessions, who purchased directly from defendants domestic ocean shipping services for shipment of goods between the continental United States and Hawaii ("Hawaii Ocean Shipping") starting at least as early as July 3, 2004 through the present (the "Class Period").

2.     Defendants are domestic ocean shipping liners who collectively transport millions of tons of cargo each year between ports in the contiguous United States and in the United States' territories and possessions.  One of the routes defendants all service is the route between the contiguous United States and Hawaii.

3.     Plaintiff alleges that during the Class Period, defendants conspired, combined and contracted to fix, raise, maintain and stabilize prices at which Hawaii Ocean Shipping would be sold.  As a result of defendants' unlawful conduct, plaintiff and the other members of the proposed Class paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for Hawaii Ocean Shipping.

## JURISDICTION AND VENUE

4.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, (15 U.S.C. §§ 15 and 26), to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by plaintiff and the members of the Class by reason of the violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

5.     This action is also instituted to secure injunctive relief against defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

6.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

7.     Venue is proper in this Judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

8.     This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the United States, including in this District; (b) participated in Hawaii Ocean Shipping throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Further jurisdictional contacts are alleged below.

## INTRADISTRICT ASSIGNMENT

9.     This action arises in Alameda County because that is where a substantial part of the events that give rise to the claim occurred. Pursuant to Civil Local Rule 3-2(d), this action should be assigned to either the San Francisco Division or the Oakland Division.

## PLAINTIFF

10.     Plaintiff E&M International Transport, Inc. is a California corporation with its principal place of business located in Hawthorne, California. During the Class Period, E&M International Transport, Inc. purchased Hawaii Ocean Shipping services directly from one or more defendants. As a result of the alleged conspiracy, plaintiff was injured in its business or property by reason of the antitrust violations alleged herein.

## DEFENDANTS

11.     Defendant Horizon Lines, Inc. is a Delaware corporation whose stock is traded on the New York Stock Exchange and that has its principal place of business in Charlotte, North

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT                - 3 -

Carolina. Horizon operates as a holding company for three wholly-owned subsidiaries: Horizon Lines, LLC; Horizon Logistics Holdings, LLC; and Horizon Lines of Puerto Rico, Inc. Horizon is the nation's leading domestic ocean shipping and integrated logistics company, accounting for approximately 38 percent of total U.S. marine container shipments from the continental United States to Hawaii, Alaska, Puerto Rico, Guam and Micronesia. During the Class Period, Horizon sold Hawaii Ocean Shipping services to customers in the United States and its territories and possessions.

12.     Defendant Horizon Lines, LLC ("Horizon LLC"), a wholly owned operating subsidiary of defendant Horizon, is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. Horizon LLC operates a fleet of 21 U.S.-flag containerships and five port terminals linking the continental United States with Alaska, Hawaii, Guam, Micronesia, and Puerto Rico. During the Class Period, Horizon LLC sold Hawaii Ocean Shipping services to customers in the United States and its territories and possessions.

13.     Defendants Horizon Lines, Inc. and Horizon LLC are collectively referred to herein as "Horizon." Horizon accounts for approximately 33 percent of the market for noncontiguous domestic ocean shipping to Hawaii.

14.     Defendant Matson Navigation Company, Inc., a wholly owned subsidiary of defendant Alexander & Baldwin, Inc., is a Hawaii corporation with its principal place of business in Oakland, California. According to its own publicity, Matson Navigation Company, Inc. is the principal carrier of containerized freight and automobiles between the U.S. Pacific Coast and Hawaii, Guam and the mid-Pacific. It is also the largest provider of noncontiguous domestic ocean shipping to Hawaii, accounting for approximately 67 percent of the market. During the Class Period, Matson Navigation Company, Inc. sold Hawaii Ocean Shipping services to customers in the United States and its territories and possessions.

15. Defendant Alexander & Baldwin, Inc. is a Hawaii corporation with its principal place of business in Honolulu, Hawaii. As part of its diversified portfolio, Alexander & Baldwin, Inc. provides Hawaii Ocean Shipping services through its largest subsidiary – Matson Navigation Company, Inc. During the Class Period, Alexander & Baldwin, Inc. sold Hawaii Ocean Shipping services to customers in the United States and its territories and possessions.

16. Defendants Matson Navigation Company, Inc. and Alexander & Baldwin, Inc. are collectively referred to herein as "Matson."

17. Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

18. All acts alleged in this Complaint to have been done by defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of defendants' business affairs.

## CO-CONSPIRATORS

19. Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

20. At all relevant times, each defendant was an agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each defendant ratified and/or authorized the wrongful acts of each of the defendants.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT                - 5 -

1   Defendants, and each of them, are individually sued as participants and as aiders and abettors in

2   the improper acts and transactions that are the subject of this action.

3   ## INTERSTATE TRADE AND COMMERCE

4   21.    The business activities of defendants that are the subject of this action were within

5   the flow of, and substantially affected, interstate trade and commerce.

6   22.    During the Class Period, defendants sold substantial quantities of Hawaii Ocean

7
8   Shipping services in a continuous and uninterrupted flow of interstate commerce to customers

9   throughout the United States.

10  ## THE JONES ACT

11  23.    For purposes of this Complaint, "Hawaii Ocean Shipping" involves merchandise

12  shipping services, primarily by container and/or barge, in the domestic trade between the

13  contiguous 48 states (primarily through West Coast ports) and Hawaii. The Merchant Marine Act

14  of 1920, commonly known as the "Jones Act," 46 U.S.C. § 100 *et seq.* governs these services.

15
16  24.    The Jones Act, a coastwise trade law, governs trade that includes the transportation

17  of merchandise between points in the United States and/or most of its island territories and

18  possessions, and associated commonwealths. *See* 46 U.S.C. § 55101 (extending Jones Act

19  provisions).

20  25.    The Jones Act seeks to "protect American shipping industry already engaged in

21  coastwise trade." *Marine Carriers Corp. v. Fowler*, 429 F.2d 702 (2d Cir. 1970).

22
23  26.    Under the Jones Act, any goods "transported by water, or by land and water . . .

24  between points in the United States . . . either directly or via a foreign port," are prohibited from

25  shipment unless the vessel transporting the goods "is wholly owned by citizens of the United

26  States for purposes of engaging in the coastwise trade" and has either been issued a "certificate of

27  documentation" or is exempt from documentation. 46 U.S.C. § 55102.

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT        - 6 -

27.    Thus, under the Jones Act, certain U.S.-owned vessels are granted the exclusive privilege to engage in coasting trade concerning shipment of merchandise to or from the U.S. territories, possessions or non-contiguous states.

28.    The Jones Act is designed to protect American shipping companies.  These laws are restrictive, prohibiting all other vessels, such as foreign-flagged, foreign built, foreign-crewed, or even foreign-refurbished vessels, from engaging in this trade.

29.    The Jones Act fleet includes over 42,000 commercial vessels and annually transports approximately one billion tons of cargo.

30.    The Jones Act's restriction on the carriage of domestic cargoes to U.S.-made, U.S.-flagged, U.S.-crewed, and U.S.-owned ships, combined with the relatively small size of these trade routes, results in oligopolistic – or duopolistic, in the case of noncontiguous ocean shipping to Hawaii – markets where only a very small number of carriers serve any route.

31.    For the shipment of merchandise from the West Coast of the United States to Hawaii, for example, Matson and Horizon account for nearly 100 percent of noncontiguous domestic ocean shipping to Hawaii – a duopoly.

32.    While Jones Act trade routes are subject to certain regulations, collusion, market sharing, allocation of customers, restrictions on capacity and other anticompetitive conduct remains illegal under the Sherman Act, subject to certain exemptions not applicable here.  *See* 46 U.S.C. § 40307 (listing exemptions).

## OCEAN TRANSPORTATION OF MERCHANDISE BETWEEN
## THE CONTINENTAL UNITED STATES AND HAWAII

33.    Ocean shipping is an effective method of moving large quantities of raw materials and nonperishable goods.  Major commodities shipped through domestic ocean shipping include

1  crude petroleum, refined petroleum products, chemicals, manufactured goods, farm products,

2  food and coal.

3      34.    The domestic ocean trade is comprised of the following three sectors: (1)

4  noncontiguous trade between the continental United States and Puerto Rico, Alaska, Hawaii, and

5  other U.S. Pacific Islands; (2) intercoastal trade between the Atlantic or Gulf and Pacific coasts

6

7  by way of the Panama Canal; and (3) coastwise trade along the Atlantic, Gulf, and Pacific coasts,

8  as well as trade between coasts and the St. Lawrence Seaway.

9      35.    Hawaii, Guam, Alaska and Puerto Rico are the four main markets for

10  noncontiguous trade between the continental United States and its islands, territories and

11  possessions.

12

13      36.    Cargo for ocean carriage is charged by revenue tons (defined as the greater of the

14  cubic measure or weight of the shipment as packed for shipping), as well as other bill of lading

15  charges such as the receiving charges, bunker charges, currency factors, etc. Overall U.S.

16  domestic ocean trades amounted to 196 million metric tons in 2002. As of December 2005,

17  revenue generated from ocean shipping in markets with carriers subject to the Jones Act was

18  approximately $2.5 billion.

19

20      37.    As a State of islands, Hawaii is almost exclusively dependent upon ocean shipping

21  to import essential commodities such as food, clothing, fuel, building materials and automobiles.

22  Local products – including pineapples, sugar, molasses and livestock – are equally as dependent

23  on ocean shipping for export to the continental United States, as well as for inter-island transport

24  and foreign exportation. Approximately 98.6 percent of Hawaii's imports are delivered via ocean

25  shipping. Over 5 million metric tons of cargo was transported through noncontiguous domestic

26  ocean shipping to Hawaii in 2003 alone.

27

28

38.    Noncontiguous domestic ocean shipping between the mainland and Hawaii is structured to make it possible for defendants to work in secret to fix prices and allocate markets. The market is a duopoly that is conducive to collusion. Defendants Matson and Horizon control 100 percent of the containerized portion of the market, and 96 percent of the total market for noncontiguous domestic ocean shipping to Hawaii. The remaining 4 percent of cargo is carried by small, specialized barge and auto carrier lines.

39.    The defendants participate in trade association activities, fostering the conspiracy alleged herein. Both the defendants are members of the Maritime Cabotage Task Force ("MCTF"), for example, a trade association founded on September 27, 1995 to protect the U.S. maritime cabotage laws. Charles Raymond and Robert Zuckerman, both of Horizon LLC, sit on the MCTF's board of directors, and the organization's chairman is Philip Grill, the executive director of Matson.

40.    The MCTF lobbies the executive and legislative branches of the federal government to promote the ocean shipping industry and to protect the interests of its members in maritime laws such as the Jones Act.

41.    Defendants Horizon and Matson also belong to the Transportation Institute. Founded in 1967, the Transportation Institute is dedicated to maintaining a strong maritime capability as a means of protecting the United States economy, including through support for Jones Act activities. Charles Raymond of Horizon serves on the Institute's board of directors.

42.    Ready access to industry data facilitates the defendants' effectuation and monitoring of the conspiracy. For example, the Port Import Export Reporting Service ("PIERS") collects and distributes data for the maritime industry, including container size and quantity, cargo quantity and unit of measure, cargo weight and volume. The distribution of this type of information within the industry has allowed defendants to police their conspiracy.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT                - 9 -

43.    In addition to the restrictions the Jones Act imposes on any company trying to

enter the domestic ocean carriage industry, there are substantial additional barriers to entry,

including: (1) entrenched market positions by the incumbent shipping companies; (2) the high

costs associated with ocean transport vessels and to build the infrastructure for those vessels; (3)

the need to develop a customer base; and (4) constraints on port space in Hawaii.  These barriers

facilitate the conspiracy alleged herein because they insulate existing shipping companies from

new competition and perpetuate the high market concentration.

44.    Horizon itself explained the following in its 2007 Form 10-K:

> Given the limited number of existing Jones Act qualified vessels,
> the high capital investment and long delivery lead times associated
> with building a new containership in the U.S., the substantial
> investment required in infrastructure and the need to develop a
> broad base of customer relationships, the markets in which we
> operate [including noncontiguous domestic ocean shipping to
> Hawaii] have been less vulnerable to over capacity and volatility
> than international shipping markets.

45.    The high degree of concentration in the industry makes it easier for competitors to

engage in anticompetitive conduct because any given route is controlled by so few companies.

This is particularly true in the duopolistic conditions found in Hawaii noncontiguous domestic

ocean shipping.

## DEFENDANTS' ANTITRUST VIOLATIONS

46.    Domestic ocean shipping services within any trade route are highly fungible

because purchasers decide, and competitors compete, largely based on price.  There are no

substitutable services for Hawaii Ocean Shipping.  Shipping heavy goods via air freight is

prohibitively expensive, for example, and there obviously are no road or rail routes between

Hawaii and the mainland United States.

47.    Price fixing and market allocation are particularly pernicious within a highly concentrated, fungible market for which adequate substitutes do not exist, as is the case here, where other methods of transportation are not easily substitutable for Hawaii Ocean Shipping even though Hawaii Ocean Shipping is fungible between carriers.

48.    The structure of the travel routes used for Hawaii Ocean Shipping services makes secret price-fixing feasible. Hawaii Ocean Shipping services is a highly standardized product, and demand is inelastic. The market is essentially a duopoly, with the defendants operating nearly free from competition. Moreover, barriers to entry exist in the form of expensive machinery and economies of scale. There is a high ratio of fixed to variable costs.

49.    Anticompetitive agreements in Hawaii Ocean Shipping services can take various forms, including the following: market allocation; restricting supply; and bunker/fuel and other surcharges.

50.    Beginning at least as early as July 3, 2004 or earlier, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy in restraint of trade to restrict competition, allocate customers, restrict capacity, and otherwise engage in anticompetitive conduct in order to artificially raise, fix, maintain and/or stabilize prices of Hawaii Ocean Shipping services and/or engaged in market allocation for those services in the United States, its territories and possessions in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

51.    The defendants imposed parallel, identical and near simultaneous fuel surcharges. Such fuel surcharges, ostensibly meant to be a separate cost component that should allow the carrier to recoup costs resulting from increased fuel prices, were used as a means of enforcing the defendants' unlawful conspiracy. In a competitive market, the imposition of a fuel surcharge by a carrier that exceeds the actual cost of fuel consumed should create competition from others, with

1    more fuel efficient carriers capturing cargo from less fuel efficient carriers because they can

2    charge less. With Hawaii Ocean Shipping services, however, defendants chose not to compete

3    through fuel surcharge pricing. A plausible explanation for this lack of competition in the

4    duopoly is that the defendants were conspiring. As defendant Horizon acknowledged in a

5    February 1, 2008 press release, Horizon was "able to generate net income and earnings per share"

6

7    based in part on "a stable rate environment" in Hawaii Ocean Shipping services and other

8    markets.

9    52.    Matson and Horizon have imposed identical fuel surcharges throughout the Class

10   Period. Both companies imposed the first such fuel surcharge in October 1999, with each

11   company charging 1.75 percent of revenue. Despite the fact that fuel costs among ocean liners

12

13   vary significantly due to a number of unique factors, such as differences in vessels and fuel

14   efficiency, different routes, the use of hedging, and individual fuel conservation efforts, the

15   following 26 subsequent adjustments to the fuel surcharge have been made, with both Matson and

16   Horizon adjusting the surcharge the same amount within days of each other:

| Effective Month & Year | Matson | Horizon |
|---|---|---|
| October 1999 | 1.75 | 1.75 |
| February 2000 | 2.25 | 2.25 |
| April 2000 | 3.25 | 3.25 |
| October 2000 | 4.25 | 4.25 |
| November 2001 | 3.25 | 3.25 |
| May 2002 | 4.75 | 4.75 |
| October 2002 | 6.0 | 6.0 |
| March 2003 | 7.5 | 7.5 |
| May 2003 | 8.0 | 8.0 |
| June 2004 | 8.8 | 8.8 |
| October 2004 | 9.2 | 9.2 |
| April 2005 | 10.5 | 10.5 |
| July 2005 | 11.5 | 11.5 |
| October 2005 | 13.0 | 13.0 |

| January 2006 | 15.0 | 15.0 |
|---|---|---|
| April 2006 | 18.5 | 18.5 |
| June 2006 | 21.25 | 21.25 |
| October 2006 | 19.75 | 19.75 |
| November 2006 | 18.75 | 18.75 |
| January 2007 | 17.5 | 17.5 |
| March 2007 | 19.5 | 19.5 |
| May 2007 | 20.75 | 20.75 |
| May 2007 | 22.5 | 22.5 |
| August 2007 | 24.0 | 24.0 |
| December 2007 | 29.0 | 29.0 |
| February 2008 | 31.5 | 31.5 |
| April 2008 | 33.75 | 33.75 |

53.    Only after the United States Department of Justice (the "DOJ") announced its investigation into the "domestic ocean carriage industry" – including Hawaii Ocean Shipping services – in April 2008 did the fuel surcharge amounts stop moving in tandem. On May 9, 2008, Horizon announced that it would raise its fuel surcharge from 33.75 percent to 35.25 percent, effective June 8. Matson announced that it would maintain its 33.75 percent surcharge ten days later. On May 21, Horizon announced that its May 9 increase in fuel surcharges would not be implemented.

54.    Matson's and Horizon's claim that the fuel surcharges were implemented to recoup increased fuel costs is dubious; the surcharges did not reflect actual fuel cost increases. It is highly improbable, if not impossible, that Matson and Horizon incurred identical fuel expense increases. Moreover, the revenue the fuel surcharges generated is dependent upon the underlying revenues generated per container and container utilization, both of which vary between the two carriers. It is not plausible that these fuel surcharges were used to only raise additional revenue to offset rising fuel costs.

55.     In addition to the lockstep fuel surcharge increases, Matson and Horizon have acted in lockstep on other matters. In the spring of 2006, for instance, Matson announced that it would no longer make surcharge changes on a quarterly basis only, allowing the company to make changes whenever it feels them to be necessary. In short order, Horizon changed its longstanding policy, announcing that it would adjust fuel surcharges "in a more timely manner."

56.     Another principal feature of the defendants' conspiracy has been through the use of shared capacity on each other's ships. Capacity sharing arrangements between Matson and Horizon allow each carrier to transport cargo on its competitor's ships at preferential rates. Absent such collusion and capacity sharing agreements, the defendants would have had to add additional vessels to their routes in order to carry their customers' cargo, which would have resulted in more capacity, more frequent service and lower prices. As the United States Department of Transportation's Maritime Administration made explicit in May 2006, excess capacity equates to competition: "[C]ompetitive downward pressure on freight rates may result from overcapacity." The capacity sharing agreements prevented such pro-competitive benefits to accrue, however, creating the functional equivalent of a monopoly over Hawaii Ocean Shipping services.

57.     In August 2001, Horizon (f/k/a CSX Lines) began shipping on Matson's mid-week sailing from Los Angeles, and eventually withdrew its own bi-weekly service.

58.     The contract, combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise and maintain, or stabilize prices for Hawaii Ocean Shipping services and/or engage in market allocation for those services in the United States, its territories and possessions.

59.     In formulating and effectuating the contract, combination or conspiracy, defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

    a.    agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of Hawaii Ocean Shipping services and/or allocate the market;

    b.    exchanging information on prices and sales volumes;

    c.    implementing and monitoring the conspiracy among cartel members;

    d.    marketing Hawaii Ocean Shipping services as being available at the agreed upon prices; and

    e.    selling Hawaii Ocean Shipping services at the agreed upon prices.

60.     The activities described above have been engaged in by defendants and their co-conspirators for the purpose of effectuating the unlawful agreements to fix, maintain, raise and/or stabilize prices of Hawaii Ocean Shipping services and/or allocate the market for those services.

61.     The conspiracy had its intended effect. An article appearing in *Pacific Business News* in January 2008 reported that the cost of shipping goods to Hawaii increased as much as 40 percent since 2005. Indeed, Horizon's former Chief Financial Officer, Mark Urbania, acknowledged during a conference call discussing the 2007 fourth quarter financial results that price increases have been sustained in a difficult economic environment because all competitors have shown good discipline on pricing.

## GOVERNMENT ANTITRUST INVESTIGATION

62.     On April 17, 2008, it was disclosed that the DOJ began an investigation into "domestic ocean carriage," including Hawaii Ocean Shipping services. That same day, Horizon Lines, Inc. acknowledged that federal agents served warrants and a grand jury subpoena on the

1    company in connection with the investigation. Defendant Alexander & Baldwin, Inc. confirmed

2    that it was preparing to receive a DOJ subpoena related to the investigation. In its Form 10-Q

3    filed with the Securities and Exchange Commission on May 2, 2008, Alexander & Baldwin, Inc.

4    stated that the investigation "includes pricing practices in connection with all domestic trades,

5    including Alaska, Hawaii, and Guam trades."

6

7                          **CLASS ACTION ALLEGATIONS**

8    63.    Plaintiff brings this action on behalf of itself and as a Class action under the

9    provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf

10   of the following Class:

11           All persons and entities in the United States, and its territories and
             possessions, who purchased domestic ocean shipping services for
12           service between the continental United States and Hawaii ("Hawaii
             Ocean Shipping") directly from a defendant between at least as
13           early as July 3, 2004 and the present. This class excludes any
             judicial officer who is assigned to hear any aspect of this action,
14           governmental entities, defendants, co-conspirators, other sellers or
             providers of Hawaii Ocean Shipping services, and the present and
15           former parents, predecessors, subsidiaries and affiliates of the
             foregoing.
16

17   64.    Plaintiff believes that there are at least thousands of Class members as above

18   described, the exact number and their identities being known by defendants, making the Class so

19   numerous and geographically dispersed that joinder of all members in impracticable.

20   65.    There are questions of law and fact common to the Class, which questions relate to

21   the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a

22   result thereof, including, but not limited to:

23           a.    Whether defendants and their co-conspirators engaged in a combination and

24           conspiracy among themselves to fix, raise, maintain and/or stabilize prices of

25
26           Hawaii Ocean Shipping services and/or engaged in market allocation for those

27           services sold in the United States, and its territories and possessions.

28           b.    The identity of the participants in the conspiracy;

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.          CLASS ACTION COMPLAINT                    - 16 -
ATTORNEYS AT LAW

c.     The duration of the conspiracy alleged in this Complaint and the nature and

character of the acts performed by defendants and their co-conspirators in

furtherance of the conspiracy;

d.     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.     Whether the conduct of defendants and their co-conspirators, as alleged in this

Complaint, caused injury to the business and property of plaintiff and other

members of the Class;

f.     The effect of defendants' conspiracy on the prices of Hawaii Ocean Shipping

services sold in the United States and its territories and possessions during the

Class Period; and

g.     The appropriate measure of damages sustained by plaintiff and other members of

the Class.

66.     Plaintiff is a direct purchaser of Hawaii Ocean Shipping services and its interests

are coincident with and not antagonistic to those of the other members of the Class. Plaintiff is a

member of the Class, has claims that are typical of the claims of the Class members, and will

fairly and adequately protect the interests of the members of the Class. In addition, plaintiff is

represented by counsel who are competent and experienced in the prosecution of antitrust and

class action litigation.

67.     The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications.

68.     Defendants have acted, and refused to act, on grounds generally applicable to the

Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT                - 17 -

69.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable and is one for which records should exist in the files of defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

71.     Plaintiff had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to April 17, 2008, when it was revealed that the DOJ was investigating Hawaii Ocean Shipping services.

72.     Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT                 - 18 -

73.    Because the contract, combination, or conspiracy was kept secret by the defendants, Plaintiff was unaware of the fact that prices of Hawaii Ocean Shipping services were secretly raised, fixed, maintained or stabilized as alleged herein.

74.    As a result of the fraudulent concealment of the conspiracy, plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by plaintiff and the members of the Class.

## CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1

75.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

76.    Beginning at least as early as July 3, 2004, and continuing thereafter, defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Hawaii Ocean Shipping services in the United States, and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

77.    Defendants' unlawful conduct resulted in artificially high prices charged by defendants and their co-conspirators to plaintiff and the members of the Class for Hawaii Ocean Shipping Services.

78.    Plaintiff and members of the Class had to pay more for Hawaii Ocean Shipping services than they would have paid in a competitive marketplace.

79.    Plaintiff seeks to recover for these overcharge damages.

80.    As a direct and proximate result of defendants' scheme, plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and

1    property, in amounts which are presently undetermined. Plaintiff's injuries consist of paying

2    higher prices to purchase Hawaii Ocean Shipping services than he would have paid absent

3    defendants' conduct. Plaintiff's injuries are of the type the antitrust laws were designed to

4    prevent and flow from that which makes defendants' conduct unlawful.

5

6                                    **PRAYER FOR RELIEF**

7            WHEREFORE, Plaintiff prays as follows:

8        A.      That the Court determine that this action may be maintained as a class action under

9    Rule 23 of the Federal Rules of Civil Procedure.

10       B.      That the contract, combination or conspiracy, and the acts done in furtherance

11   thereof by defendants and their co-conspirators, be adjudged to have been in violation of

12   Section 1 of the Sherman Act (15 U.S.C. § 1).

13

14       C.      That judgment be entered for plaintiff and members of the Class against

15   defendants for three times the amount of damages sustained by plaintiff and the Class as allowed

16   by law, together with the costs of this action, including reasonable attorneys' fees.

17       D.      That defendants, their affiliates, successors, transferees, assignees, and the officers,

18   directors, partners, agents and employees thereof, and all other persons acting or claiming to act

19   on their behalf, be permanently enjoined and restrained from, in any manner:

20

21       (1)     continuing, maintaining or renewing the contract, combination or conspiracy

22               alleged herein, or from engaging in any other contract, combination or conspiracy

23               having a similar purpose or effect, and from adopting or following any practice,

24               plan, program or device having a similar purpose or effect; and

25       (2)     communicating or causing to be communicated to any other person engaged in the

26               manufacture, distribution or sale of any product except to the extent necessary in

27               connection with a bona fide sales transaction between the parties to such

28

1   communications.

2   E.     That plaintiff and members of the Class have such other, further and different

3   relief as the case may require and the Court may deem just and proper under the circumstances.

4

## JURY DEMAND

5   Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all

6   triable issues.

7

8

9   Dated: July 23, 2008

Respectfully submitted,

10  By: _____

11  COHEN, MILSTEIN, HAUSFELD &
                TOLL, P.L.L.C.
12  Michael P. Lehmann
    Christopher L. Lebsock
13  Jon T. King
    Arthur N. Bailey
14  One Embarcadero Center
    Suite 2440
15  San Francisco, CA 94111
    Tel: (415) 229-2080
16  Fax: (415) 986-3643
    E-mail: mlehmann@cmht.com
17            clebsock@cmht.com
              jking@cmht.com
18            abailey@cmht.com

19  Michael D. Hausfeld
    Benjamin D. Brown
20  COHEN, MILSTEIN, HAUSFELD &
                TOLL, P.L.L.C.
21  1100 New York Avenue, N.W.
    Suite 500, West Tower
22  Washington, D.C. 20005
    Tel: (202) 408-4600
23  Fax: (202) 408-4699
    E-mail: mhausfeld@cmht.com
24            bbrown@cmht.com

25

26

27

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
    P.L.L.C.
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT                    - 21 -

Seth R. Gassman
COHEN, MILSTEIN, HAUSFELD &
    TOLL, P.L.L.C.
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Tel: (212) 838-7797
Fax: (212) 838-7745
E-mail: sgassman@cmht.com

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
Suite 4500
111 West Second Street
Jamestown, NY 14701
Tel: (716) 664-2967
Fax: (716) 664-2983
Email: artlaw@alltel.net

Francis O. Scarpulla
Craig C. Corbitt
Patrick B. Clayton
ZELLE HOFMANN VOELBEL MASON &
    GETTE, L.L.P.
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
Tel: (415) 693-0700
Fax: (415) 693-0770
Email: FScarpulla@zelle.com
        CCorbitt@zelle.com
        PClayton@zelle.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT